## RADIATOR SPECIALTY CO. v. BUHOT.

No. 4215.

Circuit Court of Appeals, Third Circuit.

Feb. 27, 1930.

E. Hayward Fairbanks, of Philadelphia, Pa. (Paul B. Eaton, of Charlotte, N. C., and John Q. Frey, of Newark, N. J., of counsel), for appellant.

Paul H. Wendel, of Trenton, N. J., for appellee.

Before WOOLLEY and DAVIS, Circuit Judges, and MORRIS, District Judge.

WOOLLEY, Circuit Judge.

The plaintiff sued for infringement of Letters Patent No. 1,613,055, issued to him on January 4, 1927. Only the first claim was in suit. The single issue was validity of the patent, the defendant admitting that, if valid, he infringed. The learned trial court found the patent invalid for want of invention in view of the art and dismissed the bill. The case is here on the plaintiff's appeal.

The invention, as disclosed by the claim, is for a composition of matter "for stopping leaks in hot-water circulating systems, comprising a mixture of aluminum, flaxseed meal, sulphur and soap," in about the proportions, as disclosed by the specification, of

Powdered Aluminum, 15 per cent.
Flaxseed Meal, 60 per cent.
Sulphur, 5 per cent.
Soap, 20 per cent.

In order to determine whether the claimed invention constitutes progress in a useful art for which the inventor is entitled to the reward of a patent, clause 8, § 8, art. 1, of the Constitution, we shall first inquire in what art the invention stands, and what arts, seemingly analogous or related, are outside its borders. This inquiry will be pursued along lines that distinguish not merely the physical differences in the arts but particularly the difference in their problems.

The inventor defines his art as that of stopping leaks not everywhere but "in hot-water circulating systems," of which the best illustration (though not a limitation) is the hot-water circulating system of an automo-

bile combustion engine, including the radiator, to which, for convenience and because it is there that most leaks occur, we shall address our discussion. Admittedly this art is crowded.

But leaks also occur in the inner tube of an automobile tire and many preparations or compositions of matter have been invented to stop them. Whether an analogous or a different art, it, too, is crowded.

There has been a tendency, because of the fact of leaks and the common desire to stop them wherever they occur, to regard both arts as one. In consequence, the crowds of inventors in the two arts have become badly mingled and their inventive conceptions have become mixed and confused when applied to the problems and remedies of one art or the other.

The test whether the arts are the same or different lies not in the fact, or in the thought, of leaks, common to both arts, but in the difference in leaks, in the place of the leaks, in the problems arising from difference in place and structure and in the means and methods of solving them.

In an automobile tire with its inner tube, which for convenience we shall regard as a unit, there is no "hot-water circulating system." The tire is, therefore, on the patentee's definition, outside the art of the patent. But it has, nevertheless, a fluid circulating system, normally that of air. Availing themselves of this fact, inventors conceived that if some leak-stopping composition were injected into the tire, it would circulate with the air and any added fluid and, coming upon a puncture or leak when it occurred, would stop it. Thus, when such solid matter is injected and added to the air or other fluid, the tire has an artificial circulating system, though of course not a "hot-water circulating system", for there is no conceivable way of making water in a tire hot, except through friction, and of keeping it hot all the time. To make a composition that will stop leaks in tires, inventive minds, differing in detail, have run along two very definite lines. One is to get some material, vegetable or mineral, which on becoming moist will swell and on entering the leak will plug it. They have found and used several kinds of vegetable matter, such as rice, flour, gambier, rubber flakes, oatmeal, rye meal, and, more often, flaxseed meal. They have also used the minerals magnesium and asbestos. In early days, they used the animal product—chicken feathers.

Inventors realized, of course, that if the dry and solid vegetable, mineral or animal leak-stopping material were put in the tube without some medium other than air by which it could be carried with the revolutions of the wheel to the entire inner surface of the tube, the leak stopping materials would not reach the leaks and, therefore, would not stop them; so they resorted—this is the inventors' second uniform practice—to a carrier of a gelatinous, glutinous, sticky or ropey consistency, such as sugar, dextrin, glucose, molasses, glycerin and glue which, carrying the solids in heavy solution, will, by force of the compressed air, exude into a puncture and, hardening by oxidation, plug it and stop the leakage of air.

This, roughly, is the tire leak-stopping art.

The structure and leak problems of an automobile circulating system are altogether different from those of a tire. In the first place, there is a difference of temperature, the difference between a hot engine and a cold tire. In the next place, the system holds water instead of air. The water becoming heated as it circulates around the hot parts of the engine must later be cooled so that on its return to the engine it will keep it at a predetermined temperature. To cool the water, whose temperature, volume and circulation are all carefully calculated with reference to engine temperature, resort is had to the familiar radiator, with its myriads of apertures through which the cool outside air is drawn by fan power. The organization of the radiator is such as to effect the greatest possible radiation. To that end there is made and exposed the greatest possible radiation surface. This is accomplished by making numerous water passageways through narrowly separated sheets of metal extending from the front backwardly. Taking one passageway between two sheets as an example of all, the passageway is increased in surface exposure by indenting the metal sheets so that they have innumerable lumps and protuberances. The passageway between these two lumpy sheets of metal is not more than $\frac{1}{16}$ to $\frac{1}{8}$ of an inch in diameter so that the hot water in the process of being cooled by radiation flows from the top of the radiator downwardly through these passageways in thin sheets and (according to the testimony in another case before us) changes direction equal in degrees to 20,000 right angles in its descent. Here is an organization of myriads of irregular and narrow spaces which to permit free circulation must not be clogged by foreign matter.

Leak stopping compositions such as that of the patent in suit are put in the system and

carried wtih the water through the narrow passageways of the radiator hunting for tiny leaks. Any materials in the composition that would clog the passageways would make the composition inoperative—indeed, they simply would not be tolerated. The materials must therefore be small and liquid enough to flow with the water without impeding or interfering with the carefully predetermined circulation and be large and solid enough to stop a leak when they find it.

The organization and requirements of a radiator are therefore radically different from those of a tire where the single channel of circulation is smooth and regular and equal in size to the inner circumference of the tube—as large as a man's arm or leg— and where no problem of circulation and hence no problem of clogging is present. Therefore, inventors in the radiator art, while they use the leak stopping element of cereals such as oatmeal and rye meal and, more generally, of flaxseed meal, because of their swelling quality, avoid heavy, sticky, ropey, glutinous carriers and seek lighter ones that will not gum or clog the narrow passageways. The leak stopping composition put into the radiator is, by the constantly pumped water, in constant movement throughout the system, and when it comes to a leak, usually smaller and always more difficult to reach than a leak in a tire, it flows into it, chokes it, oxidizes and stops it.

This, roughly, is the radiator leak stopping art.

Although no composition of matter in the tire art similar to the composition of matter, with its four elements, of the patent in suit has been shown us, we have made this lengthy comparison in order to give our reason for putting out of the consideration of this case an art which is not the art of the patent in suit, and also our reason for excluding the references in that art which in themselves have no bearing on the issue.

The art of stopping leaks in tires is not analogous to that of the patent.

George I. Ray, the plaintiff patentee, was not the first in this field; indeed, he was, so far as the record shows, the last. Yet the gate was still open to him and to anyone with an inventive improvement upon the work of those who had entered before. His invention is therefore not basic. The defendant, however, says it is not invention at all, in proof of which he points first to one and then to another of the four elements of its composition found here and there in prior patented compositions for this and other purposes, but he points to no composition in this or any other art where all are present together. Yet he says these elements, thus scattered, if not amounting to anticipation constitute an art that negatives invention in bringing them together in combination.

The four elements of Ray's leak stopping composition are, as we have said, flaxseed meal, aluminum, soap and sulphur.

Flaxseed meal is found everywhere. It is the element that swells. It has been demonstrated to be about the best for the use and is the base of the composition in volume and function. If the patent were for flaxseed meal alone, it would, of course, be invalid, just as a patent for steel alone would be invalid.

While flaxseed meal is a popular base, it is not found in combination with the other three elements.

Aluminum is found in the patent to Mark G. Ray in combination with flaxseed meal but not with soap and sulphur.

Soap is found in Hill but not with flaxseed, aluminum and sulphur.

Sulphur is found in one leak stopping composition for pneumatic tires (Gabe), bisulphide of carbon in a radiator leak stopping composition (Crum) and soda bi-sulphide in sealing paste (Key), but not with the other elements. If Ray went shopping through the art it is evident he found little that suggested bargains in soap and sulphur. However that may be, he patented a composition of matter consisting of four elements. Assuming that all were old, it is, on this record, absolutely certain that the combination was new. "It is, however, the combination that is the invention, and is as much a unit in contemplation of law as a single or noncomposite instrument." Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S. 325, 29 S. Ct. 503, 505, 53 L. Ed. 816. Familiar illustrations of this legal fact are steel alloys where the steel base, like the flaxseed base here, is old. So also are nickel, chromium, tungsten, molybdenum old. Yet many combinations of these old elements whose individual characteristics and behavior were well known have been held inventions of high order.

Being indubitably new, we next inquire whether the composition of the patent in suit is patentably novel. This takes us to the history of the invention and to the patent itself.

In 1922, Mark G. Ray, uncle of the plaintiff patentee, George I. Ray, put out a composition, under patent No. 1,377,275 granted

him in 1921, for stopping radiator leaks composed of flaxseed meal, aluminum, graphite, washing soda and lye. George I. Ray subsequently took over his uncle's business. When he tried to mix the ingredients called for by the Mark Ray patent he found that spontaneous combustion resulted and that the product could not be put into containers and marketed. He found that the flaxseed meal lumped, due to weevil formation. Lumps clog a circulating system. He also discovered that washing soda made the meal rancid. He thought this caused lumps. After experimenting, George I. Ray hit upon the idea of eliminating graphite, soda and lye from the composition of his uncle's patent and of adding soap and sulphur to the flaxseed meal and aluminum. He tried it and it worked, producing the action, re-action and co-action of the elements as stated in his patent, which we shall not repeat in detail. It will be enough to say that in his specification he claims, and in a measure has proved, that soap acts as an agent for suspending the aluminum and flaxseed meal thereby preventing their settling to the bottom of the circulating system; that it co-acts with the linseed oil of the flaxseed meal in carrying the aluminum to the leak and there cleanses the surface around the leak which aids the oxidized aluminum permanently to cling to the metal; that it re-acts upon the aluminum to form an aluminum hydroxide which in turn transforms the free soap, which is soluble, into insoluble soap. He further claims in his specification that sulphur converts the oxidized aluminum at the leak into a tough, fibrous, metallic patch so that, distinguished from a brittle patch, it will not be dislodged by jolts; and that, further, it acts upon the flaxseed meal as an insecticide and causes it to remain fresh, insoluble and elastic after being placed in the compound.

We are not certain, on the proofs, that all these elements perform precisely the physical and chemical functions claimed for them. But, on the proofs, we are certain that somehow they (in combination) avoid the spontaneous combustion of the Mark Ray composition and eliminate the lumps, a very real achievement without regard to the reason, known or unknown, and that they form a composition which is a long step in advance of that of the Mark Ray patent, the nearest reference. We are satisfied that the composition of the patent, concededly new, is patentably novel.

And, finally, we inquire, is it useful? It is, on the defendant's admission of infringement. Is it patentably useful? We think it is. Were we in doubt, and only in case of doubt, we should turn to the trade and seek its appraisal of its usefulness by the manner of its acceptance. The plaintiff, after he had perfected his composition and put it on the market with a force of twelve salesmen and the expenditure of $4000 in advertising, sold in fourteen months over a million cans of the product. We have not been convinced that this commercial success in a highly competitive market was due to forced salesmanship, extensive advertising and business energy. McClain v. Ortmayer, 141 U. S. 427, 12 S. Ct. 76, 35 L. Ed. 800.

The question of invention being a question of fact, to be determined, however, by rules of law, Poppenhusen v. Falke, Fed. Cas. No. 11280, 5 Blatch. 49, we are constrained to hold the patent valid on a fact finding of invention in its subject matter. In announcing this judgment we may observe that, though invention, it is not a great one. Yet, though not the work of genius, it still may be invention. Invention is not always the offspring of genius; more frequently it is the product of plain hard work; not infrequently it arises from accident or carelessness; occasionally it is a happy thought of an ordinary mind; and there have been instances where it is the result of sheer stupidity. It is with the inventive concept, the thing achieved, not with the manner of its achievement or the quality of the mind which gave it birth, that the patent law concerns itself.

The decree of the District Court is reversed with direction that the bill be reinstated and the proceedings thereafter be conducted in conformity with this opinion.