**RESPRO, Inc., v. VULCAN PROOFING CO.**

No. 5399.

District Court, E. D. New York.

Aug. 22, 1932.

Briesen & Schrenk, of New York City (Hans V. Briesen, of New York City, Eugene

A. Kingman, of Providence, R. I., and Fred A. Klein, of New York City, of counsel), for plaintiff.

Mock & Blum, of New York City (Asher Blum, of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This is a suit in equity brought by the plaintiff against the defendant for relief by injunction and damages for the alleged infringement of patent No. 1,411,376, issued by the United States Patent Office to Roland B. Respess, assignor by mesne assignments to Respro, Inc., for process of making a leather substitute, dated April 4, 1922.

The corporate status of the parties, plaintiff's title to the patent, and the receipt by the defendant of notice of infringement, are admitted.

The defendant interposed an answer setting up the defenses of invalidity and noninfringement.

Prior to the invention of the patent in suit, manufacturers of shoes had, for a great many years, been sorely troubled and suffered considerable losses in the use of real leather for quarter linings and the like.

To overcome this condition one substitute after the other was tried and abandoned, but when Durakalf, made by the process of the patent in suit, made its appearance on the market, this problem of long standing was solved.

The witnesses are all in agreement that the Durakalf product was a new product and unlike anything which had preceded it, and among them is Lewis, the technical superintendent of the defendant, who had been associated for many years in the production of artificial leather with some of the most prominent manufacturers, to wit, Du Pont of Wilmington, the Harts Company of New Haven, and Van Clief Brothers of Chicago.

The patent in suit requires the use of woven fabric; it does not include unwoven felt or cotton batting. It requires the woven fabric to be subjected to a process of napping, and does not include unnapped woven fabric.

The use of the napping machine is for the purpose of pulling a part of the twisted fibers from the threads or cords comprising the fabric to form a fibrous surface on each side of the woven fabric, with a part of such loose fiber attached to the twisted threads of the sheet.

The prepared fabric is then wound in a

machine upon a core to form a tightly wound roll.

Such rolls of fabric are then placed in a machine similar to a doubling or facing machine, having two pressure rolls which travel at the same speed.

As the fabric is unwound under tension it is saturated with an adhesive agent which is pressed into the fabric between the pressure rolls. It then passes to a drying chamber and the solvent in the adhesive agent is evaporated. After that, the fabric is subjected to tension and again passed between rollers and pressed. The fabric is then ready for use for some purposes. If it be desired to introduce an additional quantity of adhesive agent, the process may be repeated.

The patentee in the specification expresses a preference for the use of a rubber compound containing a vulcanizing agent as the saturating adhesive agent, but does not limit the patent thereto, but says that any other suitable adhesive agent may be used. If a rubber compound is used, the next step is to vulcanize the sheet to set the rubber. If desired, the sheet may thereafter be again passed between the pressure rolls. If other adhesive saturating agent be used, the treatment may be varied in accordance with the mixture used.

The adhesive agent must be of a more or less viscous nature, and because of that fact the patent requires the application of pressure to bring about a thorough combination between the rubber and the napped woven fabric.

If a thin bodiless solution be used, it might well penetrate the napped sheet, and the application of pressure would result in partially squeezing out or removing the binding element which it is necessary to retain in the sheet to produce the qualities designed to be produced by the patented process.

The patent does not teach the use of the saturated adhesive agent as an adhesive surfacing agent, which, when applied to a woven napped fabric, would penetrate deeper than when applied to an unnapped woven fabric, but teaches the complete amalgamation by pressure of the saturating adhesive agent with the napped woven fabric, so that, when the solvent is evaporated, the yarns of the weave will still remain completely surrounded with the saturating adhesive agent, while each napped fiber on the surface is also surrounded with a thin film of the saturating adhesive agent.

The purpose of the application of pressure under tension following the drying step is to lay down the filmed napped fibers to form a matted surface upon the impregnated interior structure of the fabric, and the amount of tension or of pressure applied may vary, provided it be sufficient to accomplish said purpose. Such application of pressure under tension will also obscure the appearance of the weave of the fabric and cause the surface to assume the general appearance of undressed leather.

The pressing under tension of the patent in suit differs from a process in which the product might be dried on a loop dryer or festoon and then vulcanized, the surface of the product of which would consist of myriads of loose fibers positioned and held in that state by the vulcanized rubber surrounding the fibers, whereas in the product of the process of the patent in suit, the fuzz condition in the rubber-filmed, dried, napped fibers is by the application of pressure under tension brought into a smooth surface condition.

By the pressure for saturation the nap fibers are pressed against the body of the fabric, but as they adhere to the sticky pressure-applying surface, the fibers are pulled out from the body of the fabric and prevent the formation of a solid homogeneous mass. These fibers by the application of pressure after drying become a part of the ultimate surface but are left arched and stringy, and thereby give to the product an essential characteristic which makes it valuable as a cushiony quarter-lining.

If desired, the process provides that the prepared fabric may be coated with a surface dressing of one or more coats, and, if it should be further desired, an embossing design may be impressed on the coated fabric by a plate or roller embossing press.

The fabric produced by the process of the patent in suit is compact like leather, with a matted fiber or felted surface under the dressing, and on the undressed side, if only one side is finished, the fibrous surface being firmly attached to the part of twisted threads which originally composed the woven fabric before a part of the fibers were pulled out by the napping machine.

The strength of this fabric may be relatively greater than the original woven fabric.

There is, in the product of the patent in suit, no working against each other of the threads when used, separating them from or straining the surface dressing as in artificial leather before the invention of the patent in

suit, but the threads are held firmly in their original position.

There may be used in producing the leather substitute, described in the patent in suit, one adhesive agent for the treatment of the fabric, and another adhesive element may be used for the surface dressing, or the same agent may be employed both for treatment and surface dressing.

If two are used, it is preferable to press the surface dressing into the fabric between pressure rolls, when the first one or two coats are put on, and after that additional coats may be put on in the usual manner by hand or knife-coating machine.

The product of the process of the patent in suit possesses in combination many valuable qualities and attributes, strength, moldability, porosity, plumpness, softness, springiness, resiliency, breathing qualities, nonraveling of edges, and the appearance of leather which are the direct result of the process by which it is produced.

The appearance of undressed leather cannot be foreseen in the early steps of the process of the patent in suit, but the appearance of the fabric changes with the final pressing under tension, and it no longer has the appearance of a napped fabric but assumes that of undressed leather.

There is no attempt in the process of the patent in suit to imitate the structure of leather, but the result is accomplished by the use of woven fabric and an adhesive, and a proper co-ordination of the features of the process.

It is true that plaintiff has no patent for the product, and it is also true, as urged by defendant, that mere superiority of plaintiff's product would not be proof of invention; but when, as here, after repeated unsuccessful efforts on the part of others, the plaintiff, solely as the result of applying the process of the patent in suit, has been able to produce a product which entirely fills the long felt want of a leather substitute, especially in the manufacture of shoes, such success may well be considered as evidence of invention in the discovery of the process as opposed to the skill of the mechanic.

The suit is based on claims 1 and 2 of the patent in suit, which read as follows:

"1. The herein described process of making a leather substitute consisting in treating a woven fabric in a napping machine to produce a loose fiber surface on the fabric, saturating the fabric with a binding agent, subjecting to pressure, drying the sheet and pressing under tension.

"2. The herein described process of making a leather substitute consisting in treating a woven fabric in a napping machine to produce a loose fiber surface on the fabric, saturating the fabric with a binding agent, subjecting to pressure, drying the sheet, pressing under tension and coating the product with a surface dressing."

Claim 1 covers the process whether a surface dressing is used or not.

Claim 2 includes the final step of coating the product with a surface dressing.

Defendant offered in evidence the following prior art patents:

British patent No. 178 A. D. 1858, issued to William Kemble Hall, for improvements in the manufacture of artificial leather, which did not proceed to the great seal.

This patent was cited only to show the use of moleskin, which is a cheap twilled manufacture with a napped surface.

This patent teaches the impregnation of a suitably woven or felted fabric with an aqueous solution, a solution of glue, modified grease, the grease modified to change part of the solution into the form of soap to accomplish their combination with water as a solvent, tannic acid and mucilaginous matters by terra japonica, and after the impregnation, which is not described, the dipping of the fabric into a solution of alum or other similar reagent, by which the entire material is rendered insoluble in water. Drying is not described but must take place.

There is no suggestion, even, of the use of any pressure between the time that the coating is applied and the drying is finished. The inventor excludes the use of expensive oils or compositions of india rubber.

British patent No. 2850 A. D. 1871, issued to Thomas Wolstencroft Booth, for an improved material to be used as a substitute for leather, which received provisional protection only. The inventor takes a thin felted material or fabric, coated on one or both sides with india rubber, gutta-percha, or similar waterproof material, using by preference what is well known as "Clark's Patent Packing Felt," and applies to either the felted or the coated surface thereof a layer of coloring material, which latter is composed of any suitable powdered coloring matter mixed into a thick paste with a solution of glue, gelatine gum, or other suitable glutinous or gummy substance soluble in water

or spirits. He then smooths the surface by means of a "doctor plate" or otherwise, and drys the material by passing it over heated cylinders or in any other convenient manner.

There is no teaching therein of the use of pressure, and the inventor does not state that before drying he uses any pressure in connection with this type of material.

United States patent No. 231,692, issued to James Tregurtha, assignor to Chase, Merritt & Blanchard, for machine for making artificial leather, dated August 31, 1880. This patent does not contain a reference to a napped fabric; it refers to a "fibrous or cloth base closely textured," not to a fibrous cloth base.

This is not a disclosure of the first step in the process of the patent in suit, passing the sheet through a napping machine to pull a part of the twisted fibers from the woven threads to form a loose fiber surface on each side of the woven sheet, with a part of each loose fiber attached to the twisted threads of the sheet.

There is a natural nap to every cloth when the thread is manufactured by twisting the fibers together, as there are loose ends, free ends, but they do not constitute napped fabrics.

And the failure of Tregurtha to disclose the step of napping is a failure to disclose the process of the patent in suit.

The inventor states that he spreads upon the base as a surfacing the rubber compound that he describes. He says that the apparatus embraces a spreading device. He also refers to the spreading knife C. He repeats the word "spread" and refers to the rubber solution as a surfacing composition.

The patentee uses a rubber solution but it is a spreading and not a saturating material. This is apparent because, if the material ran through, there would accumulate a wet mass of adhesive upon the roll A', which is elevated somewhat above the working surface of the blade C, and between the blade C and the steam or hot air pipes D, and before any drying operation is carried out.

The patentee says in the patent that the pores of the fabric are filled with the surfacing compound, but that is all he says on that subject, and as the patentee all through the patent emphasizes the fact that he is coating the material, and this machine is almost standard for coating artificial leather, especially in the pyroxylin industry, it seems to me that it is a machine for coating materials. There is a distinction between coating and saturating.

Coating is a layer that lies on the surface and is anchored to the fabric in the pores of the fabric.

If the coating material is of sufficient strength it can be separated as a coat from the fabric.

A coat is a layer proposition that is integrate throughout, and is not usually broken up in any way nor subdivided.

Saturation presents a different situation. There the material, when it is saturated under pressure, forms a thin film upon each and every individual fiber, and where the coating around each and every individual fiber is intact, they do not make a sheet layer of the adhesive considered as a whole. They subdivide it, and, if rubber cement is used, make a condition such as a very much airified sponge rubber in which the points of contact are between where the fibers come together.

In making a coating you can get along with a knife-spreader, but in making a saturated material, some positive force like pressure rolls is required. The product of the Tregurtha machine would be a sort of standard rubber coated fabric, not like the product of the process of the patent in suit, nor could it be put to the same uses.

Defendant's contention that Tregurtha might have the right to run a napped fabric through Tregurtha's machine does not seem to me to aid defendant, as by so doing Tregurtha would not be practicing plaintiff's process, as he would still be practicing the coating or spreading principle and not saturization under pressure. To practice plaintiff's process, Tregurtha would have to reconstruct his machine.

United States patent No. 238,496, issued to Charles A. Evans, for manufacture of india rubber and gutta-percha cloth, dated March 8, 1881. This is essentially an amplification of the Tregurtha patent, connected with the utilizing of a particular compound. It relates to the manufacture of goods surfaced with the compound, and the product of this patent would be somewhat like that of the Tregurtha patent, except that the surface would have an embossed design. The product would be in a totally different class from one made under the process of the patent in suit, and could not be used for the same purposes.

Even if defendant's contention be correct, that in applying a pebbling roller to impart a surface design to his product, he

employs the step of pressure under tension, the Evans patent omits all reference to essential steps in plaintiff's process.

United States re-issue patent No. 11,467 (original patent No. 508,497), dated November 14, 1893, issued to Frederick George Annison, for show bill, poster, etc., and method for producing same, dated January 22, 1895. The inventor does not specify a napped fabric, but he mentions the word "napped," referring to the material he is using, that naturally has a slight nap on it, not material that has been napped.

The inventor is making a material to use for show bill, poster, tablets, and wall decorations, and when he saturates this material with the solution of xylonite, celluloid, or ivorine, the nap will be accentuated by being coated, as he says, by little xylonite coated spires. This material, after it is dried, is very like celluloid in nature, somewhat hard and bony in characteristic, and is pressed flat leaving a surface which adapts the article to receive ink or the substance employed ffor decorating it. Pressure is applied after it is dried by rolling it down with hot rolls to make it smooth. Celluloid and xylonite or ivorine are solid solutions of nitrocellulose in camphor, that is, the material is hard or bony in character but by means of the heated rolls, under the influence of heat, these characteristics are made milder, so mild, for instance, that celluloid articles can be molded when pressure and heat is put upon them. The operation conducted by the patentee is more or less a molding one, in which he puts these coated spires into the plane of a fabric body itself, so that he will not get an irregular sort of impression when he prints with ink. What he wants to make is a smooth product on which he can print an announcement that will stand the London fog, by waterproofing the cotton material or paper he uses, so that it will not change with weather conditions as would the cloth or paper.

While it was customary to take cloth and size it with some material, that material was not of a water-repellent character, but the patentee has xylonite, which is a water-repellent material.

The patent calls for the application of a coat of varnish after the printing has taken place, and the product of this patent is a stiff, boardy type of sheet material, which cannot be used for the same purposes as material made according to the process of the patent in suit. The product of the Annison patent can be molded under heat and pressure very much like celluloid, but has no natural resiliency or springiness or plumpness. No pressure is applied before drying.

United States patent No. 602,797, issued to Frederick George Annison, for art of coating fabrics or permeable materials with nitrocellulose compounds and product produced thereby, dated April 19, 1898.

This is a coating patent, not a saturating patent.

The patentee says: "In my present invention I first impregnate the permeable base with a solution of the compound sufficiently fluid to penetrate to such a depth beneath the surface as to obtain a firm anchorage within the substance of the base and then apply successive coatings of the compound, having a less degree of fluidity, as hereinafter described, until a surface having the requisite body has been attained or built up."

He refers to canton-flannel in the following words: "Where canton-flannel is used as the flexible permeable base, either the fluffy or smooth side may be treated. In practice I have generally applied the compound to the smooth side. When such solution is applied in the manner described, there is a marked and well-defined, though partial, impregnation of the base, the depth of which impregnation depends, primarily, upon the fluidity of the solution and the speed at which the base travels."

The smooth side of canton-flannel is the non-napped side.

There is no pressure intermediate between the application of the compound and the drying.

The product of that process is not comparable to, nor can it be used for, the same purposes as the product of the process of the patent in suit.

The first solution in the Annison patent is fairly thin and penetrates to a certain depth into the fabric, where the patentee wants it to stop, and after that has been accomplished, the patentee says that a quick drying of the compound is desirable.

What the patentee in that patent accomplished was the finding of an anchorage in the base for the covering and not a saturation as in the process of the patent in suit, where the solution is driven right through the material from one side to the other.

Annison sought to preserve in the interior of his product the soft fibrous characteristics of his cloth in its natural condition, unaffected by the hardening effects of the applied adhesive, and limits the penetra-.

tion of his base, and warns away from any possibility of pressure saturation.

The most vital steps of plaintiff's process are not disclosed by Annison.

Even the pressure steps of Annison are of a different order than plaintiff's, and are applied at entirely different stages of the process.

United States patent No. 719,787, issued to Louis Gevaert-Naert, for process of manufacturing artificial leather, dated February 3, 1903. The patentee uses dressed or felted tissue or fabric preferably made of cotton, and the roughened woolly or felted surface is treated with cellulose xanthate solution. The impregnation, the patentee says, is effected in a vacuum. He further says, that the fabric is introduced into a closed apparatus in which the vacuum is made, prior to the introduction of the solution of xanthate of cellulose.

From this it would seem that the fabric is not in a roll but in sheet condition, the size of the sheets corresponding somewhat to the size of the room for the vacuum, and being treated individually.

He also says that satisfaction may be attained without a vacuum by laying the fabric just before the immersion thereof upon a plate or drum heated by means of steam, and that the air contained in the fabric will be expanded by heat when the fabric is introduced into the cold cellulose solution, producing an incomplete vacuum within the fabric, whereby the impregnation is facilitated. The impregnated fabric is dried with or without being stretched, then washed, and the cellulose xanthate is fixed. The patentee says:

"The dressed fabric, which after the application of cellulose thereto resembles leather, is then impregnated with weak solutions of gutta-percha or india-rubber, or both, dissolved in a suitable solvent."

This second impregnation may be accomplished using the same weak solution of india rubber without having first impregnated with cellulose xanthate. After the drying operation is all over, the article may be made smoother or more supple or more glossy by the action of rollers, or submitted to the finishing operation used with natural leather. The product is not coated but is saturated with a dilute solution.

No pressure is applied between the time the solution comes in contact with the fabric and the time of drying. The fabric and solution are never together when pressure is exerted.

United States patent No. 873,582, issued to Louis Gevaert-Naert, assignor to Societe Anonyme Des Cuirs Et Courroies D'Audenarde, for process of manufacturing artificial leather, dated December 10, 1907. In this patent Naert teaches the use of two types of material, either a teazled or a napped cloth, or a felted cloth, and for the first time suggests the possibility of using the napped fabric.

He also says that impregnation may be carried out with a vacuum when thick materials are to be produced, or without using a vacuum when lighter articles are to be obtained.

The solution used is of "tanned gelatine, or other tanned albuminoid or proteid substances."

Those solutions are aqueous solutions to which a small amount of ammonia is added in order to keep the tanned albuminoid or proteid in solution. The patent also provides for treating the article before or after with solutions of gutta-percha, rubber, or cellulose.

In this patent pressure is not applied after the material, napped or otherwise, is brought into contact with the solution with which it is to be coated, and before the solution sets or is tanned or heated.

Defendant's contention that Naert, at page 1, lines 35–38 of his patent, "clearly shows the use of pressing the saturated material before drying the same so that any dissolved adhesive within the fabric was necessarily firmly pressed into its pores," is not sustained, as the reference in question is to a step in the process of preparing his xanthate fluid, and not a step in the process of impregnation of the fabric base.

The products of the Naert patents are not like the products of the process of the patent in suit, and cannot be used interchangeably with it.

United States patent No. 762,357, issued to William R. Smith, assignor to Buffalo Weaving & Belting Company, for textile fabric for belting and method of making same, dated June 14, 1904. This is a patent for making belting from a multiple-ply woven fabric, preferably cotton. It is not napped.

The patentee says that the chief object of his invention is to "enable the threads of a multiple-ply woven fabric to be permeated or saturated with a fluid or semi-fluid composition containing rubber, the composition being of such character that it can be cured or vulcanized within the threads by heating, thus

producing a belt of great durability and well adapted to take a sufficient frictional hold on pulleys."

He accomplishes this by the use of heated fabric, heated solution, and heated rolls, and presses the compound down into the material, and throughout fills the pores between the threads of the fabric and the minute crevices between the fibers of the threads while the fabric is in the stretched condition. He takes a multiple-ply fabric and stretches it as much as he can to make the openings as large as possible, and employs heat and pressure conjunctively to force the composition into those openings in the fabric, and in so doing makes a belt.

In referring to Fig. 5, the inventor reserves the right to himself, when he wants a softer type of material, to force the composition partly but not entirely through the thickness of the fabric, and does not limit himself to a fabric in which all the threads are permeated or saturated with a filling composition, but regards a fabric having its surface threads permeated or filled, and its internal threads left in their original condition, as an embodiment of his invention.

What the patentee is seeking is a belt for driving machines with a surface that has a clinging characteristic.

United States patent No. 1,184,870, issued to August C. Rader, for process of making artificial leather, dated May 30, 1916. The patentee says: "It is an object of the present invention to expedite the production of an artificial leather by applying the coating composition in a paste-like or plastic state and forcing it under pressure into the fabric so that a coating of the desired thickness can be applied in one operation. A further object is to produce an embossed surface upon the product, thus to enhance the appearance thereof."

He does not use a napped fabric but simply states "fabric."

His design was to spread the composition into the fabric and secure an anchorage and make part of it integral.

This patent shows none of the structures nor does it relate any of the properties that tie in with a matted fibrous surface of the patent in suit. Its fibers are not reinforced with rubber coating nor drawn out into the second napped condition, and again consolidated with the material.

That the purpose of the patentee is to force the plastic materials into the pores of the fabric sufficiently to secure a good anchorage and not through the material, is apparent from the fact that, if plastic material were forced through the holes of the fabric, the underneath side of the fabric would be wet and would cling to roll 4. This further appears from the patent, in which the patentee states: "When the product emerges from between rolls 1 and 3, it will consist of a layer of fabric having on one surface a coating of the finishing compound, said compound being forced down into the pores of the fabric so as to become an integral part thereof."

In the Rader patent there is no napping. The type of pressure used is not that of the patent in suit. No drying step is disclosed until after the coating and embossing operations are completed, and the embossed product has been taken up on the roll 12, and there is no disclosure of any application of pressure under tension.

United States patent No. 1,247,610, issued to Charles Elwood Arnold, assignor to E. I. Du Pont de Nemours Powder Company, for process of producing artificial leather, granted November 27, 1917. The process is essentially a coating one. The machine as shown applies two coats, first, a moist coat, then a plastic layer.

Arnold does not use any napped fabric, but designates a woven fabric. The product of this process will not possess the essential features of the product of the process of the patent in suit, but a product the construction of which it would be hard to differentiate from the regular Fabrikoid of the owner of the patent.

United States patent No. 1,257,756, issued to Fin Sparre, assignor to E. I. Du Pont de Nemours Powder Company, for process for producing artificial leather, dated February 26, 1918. This like the Arnold patent, which are substantially the same, is a coating process, the machine shown in both patents being identical. The product of this patent will not possess the essential features of the product of the process of the patent in suit, nor be suitable for the same use.

It thus appears from an examination of all of the prior art patents offered in evidence by defendant, that, while each element of the process of the patent in suit may be old, no single one of those patents discloses all of the elements of the process of the patent in suit, and no one of them would make a product like that produced by the process of the patent in suit, without extensive modification of the machine or process, or both,

of any of the said patents so offered in evidence, in view of the process of the patent in suit, and that would be wisdom which came after the fact and cannot defeat the claims of the patentee of the patent in suit. Vortex Mfg. Co. v. Ply-Rite Contracting Co. (D. C.) 33 F.(2d) 302, 306, 308.

Even if all of the steps of the process of the patent in suit be old, it is new and patentable as co-operating with each other they produce a result that is new and useful. German-American Filter Co. of New York v. Erdrich (C. C.) 98 F. 300, 308; Michigan Carton Co. v. Sutherland Paper Co. (C. C. A.) 29 F.(2d) 179.

Anticipation cannot be shown by picking out one step from one of the prior patents and another step from another one of the prior patents, and from a knowledge of the process of the patent in suit build up a process like it.

■ The patent in suit represents a real advance in the art and is entitled to liberal treatment.

By the practice of its process, a leather substitute for certain purposes, notably in the manufacture of shoes (for which leather only had been used in practice) which is capable not only of replacing the leather but is structurally superior thereto, can be produced, and no machine or process for the making of artificial leather, disclosed in any of the prior art patents offered in evidence by the defendant, can accomplish the same result.

The importance of the invention of the patent in suit to the manufacturers of shoes was clearly shown, and the commercial success thereof has been large.

This success was not due to the cheapness of rubber and cotton, but to the inherent worth of the product of the process of the patent in suit.

■ The patent in suit is valid.

As to infringement: On January 7, 1931, Mr. Tinsley, the chief chemist of the plaintiff, with the consent of the defendant and at its invitation, visited the plant of the defendant to make a comparison between the process used by the defendant and the process of plaintiff's patent.

He found that the defendant used a roll of napped fabric, from which roll the fabric was passed between two pressure rolls.

Immediately in front of these two pressure rolls the fabric was passed through a solution of rubber compound, and the pressure rolls forced the solution into and through the interior of the woven thread section of the goods. When the fabric left the rolls, the whole interior of the fabric was saturated by the rubber solution, while at the surfaces, the nap filmed with rubber solution stood out by reason of the fact that the rolls, by means of which the rubber had been forced entirely through and through the fabric, were covered with adhesive, and by reason thereof drew up the rubber-filmed naps before these fibers could detach themselves from the sticky cylinders.

The fabric next passed through a drying or evaporating space and was then wound up under conditions of pressure and tension.

The product was subsequently coated with an additional composition surface wherein it was further exposed to pressure and tension.

The product then received further pressure and tension between rollers, and the material was then further coated or cured.

This was the process then used by defendant, and in that process the defendant used the napped fabric, saturated the fabric with a binding agent, subjected it to pressure, dried the sheet thereafter, and then pressed it under tension.

This is the process of the patent in suit, and in using it defendant infringed the patent in suit.

Early in 1932 defendant made somewhat of a change in its process.

Again, with permission of the defendant, Mr. Hanley, research chemist for the plaintiff, on May 4, 1932, visited defendant's plant and found that defendant applied the rubber solution by hand instead of passing the fabric through a trough containing the rubber solution. This was merely a detail and wholly immaterial to the process in issue, as the rubber solution in either case settled upon the fabric and saturated it as far as it could under the given conditions. The rubber carried by the fabric, when it comes within the bite of the pressure rolls, was driven into the thread section of the fabric, in the same way as it was accomplished by following the instructions of the patent. The defendant's fabric, when it leaves the pressure rolls, will, in each case, have the interior contain rubber thoroughly saturated with the solution, and on its surface the drawnout rubber-filmed fibers of the nap. The drying or evaporating coils were shortened by a half, but the fabric was passed through twice, and the ultimate effect was the same as in its earlier practice.

At the end of the 1932 drying operation, the defendant wound up its product on a roll under conditions which involved tension and pressure.

This was the process then used by the defendant, and in that process there is a napped fabric; saturation of the fabric; the pressure roll operation; the drying step, and the final steps of pressure under tension; and also the step which involves coating with a surface dressing whenever such coating was desirable.

This process infringes the patent in suit.

Defendant's contention that to prevent the patent from being invalid, it must be limited to an operation which includes passing the product between pressure rolls after the vulcanizing step and before adding any surface coating, is not sustained.

The language of the claims does not require such operation, and the language of the specification of the patent does not warrant that interpretation.

After describing one specific example of carrying out the process, the patentee says: "When a rubber compound is used the next step would be to vulcanize the sheet to set the rubber after which the sheet may be again passed between pressure rolls if desired."

The passage of the sheet between pressure rolls after vulcanization is a matter of choice and not a step included in the claims.

A decree may be entered in favor of the plaintiff against the defendant, for an injunction, damages and costs, with the usual order of reference.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided by the rules of this court.