## NEW WRINKLE, Inc., v. FRITZ.

District Court, W. D. New York.
March 26, 1942.

See, also, 37 F.Supp. 922.

John S. Powers, of Buffalo, N. Y., and Toulmin & Toulmin, of Dayton, Ohio, (Frederick S. Duncan, of New York City, H. A. Toulmin, H. A. Toulmin, Jr., and Rowan A. Greer, all of Dayton, Ohio, and John S. Powers, of Buffalo, N. Y., of counsel), for plaintiff.

Albert Henry, of Buffalo, N. Y., Gray & Smith, of Detroit, Mich., (Elmer Jamison Gray and Arthur M. Smith, both of Detroit, Mich., and Harold E. Howlett, of Pontiac, Mich., of counsel), for defendant.

KNIGHT, District Judge.

This is a suit for infringement of certain claims of Root Patent No. 1,732,661, application filed May 25, 1927, granted October 22, 1929, and of Root Patent No. 1,896,594, application filed March 7, 1929, granted February 7, 1933. Admittedly the plaintiff is the owner of these patents. Suit was originally brought against the Pontiac Varnish Company, a Michigan Corporation (hereinafter called Pontiac). The complaint against the corporate defendant was dismissed for lack of jurisdiction. D.C., 30 F.Supp. 89.

Pontiac has assumed the direction of the defense herein and is bearing the expense thereof.

The patents relate to varnishes and enamels for the production of so-called wrinkle finishes and to articles carrying such finishes. The manufacturer supplies the liquid to the manufacturer of the article who applies it by brush or spray. The article when covered is subjected to a baking temperature accurately controlled. The Claims of Patent No. 1,732,661 in issue are article claims. The Claims of Patent No. 1,896,594 in issue include article, composition and method or process claims.

A "wrinkle finish" is described as one which has over the surface a series of parallel ridges running in irregular directions, of substantially the same height, closely adjacent to one another, and following a substantially duplicate pattern and designated as regularly irregular. It

is aptly described as "smooth like the ripples in sand blown in parallel ridges by the wind." In recent years this particular type of wrinkle finish has obtained wide use as a covering of metals, glass, stone, cardboard and numerous other surfaces. Below are shown drawings of the Root patents and also a sample of an article of manufacture with the so-called "wrinkle finish."

The defenses are non-infringement, invalidity and non-liability of defendant Fritz.

The Claims in dispute, as set forth in the complaint and included in the stipulation of the parties, are 1 and 2 of Patent No. 1,732,661, and 1, 2, 4, 5, 6, 7, 9, 10, 13, 14, 19, 22, 23, 25, 26, 27 and 28 of Patent No. 1,896,594.

Claim 1 of Patent No. 1,732,661 is typical of the claims of that patent in issue and reads: "An article of manufacture carrying a wrinkle baked coating of a dry-

Feb. 7, 1933.  F. B. ROOT  1,896,594
WRINKLE COATING
Filed March 7, 1929

Fig. 1.

Fig. 2.

Oct. 22, 1929.  F. B. ROOT  1,732,661
WRINKLING FINISH
Filed May 25, 1927

Fig. 1.

Fig. 2.

ing oil and a resin." These claims are 1 and 2 of the first patent and 5, 6, 7, 9, 10 and 19 of the second Root patent.

Claims 1, 2, 4 and 22 of the second Root patent are drawn to a wrinkle finish. Claim 1 is typical and reads: "A wrinkle finish composition comprising raw China-wood oil, a wrinkle finish resin, drier and thinner in proportions to yield a wrinkle finish when dried." Claims 13, 14, 23, 24, 25, 26, 27 and 28 of the second Root patent are method claims. These are typified by Claim 26 which reads: "The process of producing coatings on articles of manufacture which comprises applying to the surface of such articles a composition containing oxidized China-wood oil adapted upon baking to yield a wrinkled finish coating, and then baking the coated article to produce a wrinkled finish coating."

I. In view of the conclusions hereinafter made, it will be advantageous to consider whether the defendant Fritz has manufactured or sold or used any article of manufacture carrying a wrinkle baked coating of a drying oil and resin, or any composition of such wrinkled finish or practiced any process claimed to be covered by any of the claims of the patents in suit. Fritz was a salesman for Pontiac. He solicited orders from the Harrison Radiator Company for sales to it of wrinkle varnish finishes to be applied as a coating to a metal article of manufacture. Fritz was paid a commission on the sales. In addition he received an annual salary as salesman and re-payment of his expenses. Harrison through previous negotiations with the Pontiac Company had agreed upon the type of wrinkle finish to be used. The sufficiency of the finish as such after application is dependent upon not only the materials of the composition but the method of application to the metal and the degree of heat and the time of baking on the metal. Fritz brought Leonard, a chemist for Pontiac, who had helped make the Pontiac formula, to go with him on different occasions to help to formulate the material at the Harrison plant and applied it on the shells going through the ovens. During negotiations for the sale of this product, Pontiac submitted through Fritz 55 samples, wet and dry. The problem was to meet the peculiar requirements of Harrison as to temperature of its oven, the rate of the bake, and consider other factors. Fritz testified: "the chemist just came

down to formulate the material in their plant and to apply it on some of the shells going through the oven." Fritz was present at Harrison's. He knew the purpose for which these tests were to be made, and he knew that he was employed to sell the finished article.

The decision of this Court in 30 F.Supp. 89, is re-affirmed. Art Metal Works v. Henry Lederer & Bro. Inc., D.C., 36 F. 2d 267; and Davis v. Motive Parts Corp., D.C., 16 F.2d 148, cited by the defendant upon the question of the jurisdiction over Fritz, each involves the liability of an officer of the corporation which acted as a salesman for another corporation. That question is not presented here. Assuming that Claims 1 and 2 of the first Root patent and 5, 6, 7, 10 and 19 of the second Root patent are valid, Fritz was an infringer of these Claims.

II. Assuming validity, Fritz infringed Claims 1, 2, 4, and 22 of the second Root patent. He sold the composition covered by these Claims to Harrison on various occasions and made total sales of 5,000 gallons. He also solicited an order for the same composition from the Potter Refrigerator Company.

III. There is nothing in the record to show that Fritz ever engaged in the process of producing wrinkle finishes on articles of manufacture. He took none of the steps in the processes comprised in the method or process claims. He neither applied nor assisted in the applying any wrinkle coating; neither did he bake nor assist in the baking of any coating upon any article of manufacture. His only connection in this respect was in bringing the chemist Leonard to Harrison. It is, therefore, unnecessary to consider Claims 13, 14, 23, 25, 26 and 27 of the second Root patent. Fritz did not infringe these claims.

IV. Assuming validity, next we come to the question of whether the Pontiac's finished varnish infringes the patents in suit, one or both. The oral testimony and the exhibits in evidence disclose that the two compositions when applied as a finish are identical or substantially identical in appearance. Both show compositions wrinkled uniformly and in each "the general effect is that of the level surface carrying ridges projecting therefrom running more or less irregularly over the surface,"

as described in the patent. Admittedly defendant's formula is

| | Percentages |
|---|---|
| Dry Pigment Total | 14.10 |
| Modified Phenolic Type Synthetic Resin | 13.88 |
| China Wood Oil | 20.83 |
| Thinner (Without drier) | 49.93 |
| 6% Cobalt Drier | 1.26 |

This formula shows a composition of resin and oil with driers and volatile solvents. These are combined in a proper ratio to make a wrinkle finish which is the same in pattern and result as that of the patents in suit.

Typical Claim 1 of the second Root patent reads: "A composition comprising raw China-wood oil, a wrinkle finish resin, drier and thinner in proportions to yield a wrinkle finish when dried," and Claim 4 is for a composition "set forth in Claim 1 in which the ratio of oil to resin is from 8 to 25 gallons of oil to 100 lbs. of resin." Defendant uses 100 pounds of resin to 19.6 gallons of oil. The defendant uses a 6% cobalt drier. This drier is "cobalt naphthanate." All cobalt naphthanate driers are sold with a 6% metal content. Patent No. 1,896,594, specifies a drier "cobalt acetate, red lead, manganese borate, lead linoleate etc., used alone or in admixture with each other or with other driers and materials." This formula of the defendant includes high volatile solvent.

The patent teaches the use of low boiling and highly volatile thinners and states its illustrative thinners and solvents as "light naphthanate, toluol oil, benzol, petroleum." The Root Patent specifies a range of temperatures in baking. This is made necessary by reason of the fact that each manufacturer might have a different kind of furnace, air circulation and time of baking. The range specified is for metal and related surfaces; the temperatures may range from 150 to 450° F., while for wood and related materials, the temperature range may be from 120 to 140° F. Harrison baked at 285 F. temperature for 14 min. It had a forced draft system. This increased the oxidation and permitted high temperatures for short periods. Substantially the same ingredients in substantially the same proportions are shown in the above formula as are taught by Patent No. 1,896,594, and they effect like results. There is little dispute as to this. The defendant seeks to find a difference in the compositions in that certain claims of this patent include "raw China-wood oil" and Pontiac's composition uses oxidized China-wood oil. No distinction is seen in this respect because, after the varnish was cooked, the oil was no longer raw. It is further to be said that Claim 22 of the second Root patent specifies "China-wood oil" and not "raw China-wood oil." Assuming the validity of the patent, Claims 1, 2, 4, and 22 of Patent No. 1,896,594 are infringed.

V. The evidence discloses that in 1938 Pontiac employed Leonard as chemist. He had theretofore been employed by a company, a licensee of the plaintiff; that thereafter attention came to Pontiac that Harrison desired to change its metal finish, and it furnished Pontiac with a sample of the desired finish; that sample was procured through a licensee of the plaintiff. Pontiac's chemist duplicated a sample wrinkle finish in his initial effort, and he assisted, as heretofore stated, in its baking and application to the metal. It appeared that one who later became a licensee of the plaintiff endeavored to duplicate plaintiff's product without success before it had made 31 separate efforts. It is a fair conclusion from the evidence that Pontiac's chemist took advantage of the knowledge acquired through a licensee of the plaintiff to make the composition for Harrison.

VI. As to the defense of invalidity, it is claimed that the patents in suit are anticipated by the prior Hadfield Patent No. 1,252,001; by certain publications; and that they do not sufficiently disclose the alleged invention.

Varnish and enamel finishes baked on metal and other articles of manufacture have long been known. The use of China-wood oil as a component part of such finish has long been known. So far as the evidence in this suit is concerned, there was not upon the market and there is nothing in the prior art which shows a finish which is the same in appearance as that of these patents. Prior to late in 1927 when the composition of the patents first came to be used by the Atwater-Kent Radio Corporation, that corporation and others had used what has been known through this trial as a crystal or crystalline finish. This was some times known as the Jack Frost Crystal. There were other finishes under other names such as "Alligatoroid." Prior to 1927 Atwater-Kent had spent annually $750,000 to $800,000 for paints, varnishes

and enamels and 60% of its finish was the so-called crystal finish. This "crystal" finish is described as consisting of regular size so-called craters formed by relatively high ridges surrounding smooth areas or areas "made up of gross irregularities with crater like enclosures, very small parallel straight lines, substantially perpendicular side walls of the crater. There are both very large and very small lines present." The use of this so-called wrinkle finish, of the type described in the patents, has grown to a phenomenal extent in a comparatively few years. Atwater-Kent started with the purchase of 2,000 gallons late in 1927. It purchased 55,000 gallons the succeeding year, and since that time millions of gallons of this particular finish have been sold. The gallonage of wrinkle finishes averages for the last three years over 800,000 gallons per year. The record discloses that 159 manufacturers, including subsidiary companies, have taken licenses under this patent. It appears that these licensees include all of the large manufacturers of varnish in the United States, save the Pontiac Company. These factors are significant as showing a recognition by those skilled in the varnish making art of the usefulness and novelty of the wrinkle finish. Eibel Process Co. v. Minnesota, etc., Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; Minerals Separation, Ltd., v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286; Temco, etc., Co. v. Apco Mfg. Co., 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298; Electric Machinery Mfg. Co. v. General Electric Co., 2 Cir., 88 F.2d 11, and cases therein cited. The evidence clearly establishes a distinction in the process of making and baking between the crystal finish and the wrinkle. As to the composition, in crystal you use around 50 gallons of China-wood oil to 50 pounds of rosin or rosin ester. It is long on oil. The China-wood oil is a wrinkling oil, and the rosin or rosin ester is used to prevent the wrinkling. In crystal finish a small amount of drier is used against the larger taught by the patents. In the crystal finish there is no concern about the film on the top of the composition, while in the patents the reverse is taught. The idea in the latter is to set up the film as quickly as possible and to dry principally on the top. The film must stay open in order for the crystal form to take place, while in the wrinkle finish a film needs to be set on top as quickly as possible.

The following are:

1. Drawings of the Hadfield Patent No. 1,252,001.

2. A photograph of the crystal finish used by Atwater-Kent prior to the adoption of the so-called wrinkle finish.

3. A photograph of the wrinkle finish made from the defendant's alleged infringing composition

Fig. 4.    Fig. 5.    Fig. 6.

Inventors
George Hugh Hadfield
Alfred Edwin Bawtree

By _____.
Their attys.

114

Atwater-Kent Radio Set Finish

Alleged Infringing Finish

In the wrinkle finish you use a wrinkle resin for wrinkle and in crystal you use a rosin which is a non-wrinkler, a different drier and different solvent and a different oil. Baking the crystal finish is done in an impure atmosphere, while wrinkle can be baked in any kind of an oven. There is also a decided difference in the finish itself. Crystal is rough; wrinkle is smooth; crystal is apt to be brittle and to scuff off; wrinkle is tough. Wrinkle finish may be controlled so that a uniform finish may be had, while crystal is less easily controlled. Special significance between the two is the difference in the hiding qualities. In crystal the common practice is to use two coats; in the wrinkle finish due to the peculiar effect of the wrinkling a single coat ordinarily is sufficient and any defects in the metal are covered to greater extent. Root taught that the wrinkling is due to rapid oxidation of the surface of the applied film thus forming a skin over the less oxidized material on the interior of the film; the surface skin increasing in thickness and expanding laterally and the less oxidized of the material of the film being of lower viscosity flowing in the folds produced by the expansion of the surface skin. The general effect is that of a level surface broken up by ridges projecting from and running regularly over the surface. Crystalline finish is not a wrinkle finish as described in the patent and does not have the same properties as the wrinkled composition. The evidence discloses that, since the wrinkle finish came into use, the use of a finish comparable to crystalline has rapidly gone into decline. This shows a recognition of newness, novelty and usefulness. A clear distinction between wrinkle and crystal was recognized by Harrison. It had been using a crystalline finish. It sought for something different, something better in appearance and other respects, and it found it in the composition produced by Pontiac which is the composition taught through the patents.

VII. Defendant has introduced into the record numerous publications covering many years ante-dating the applications for these patents showing the use of China-wood oil in a varnish or lacquer finish. He relies principally upon the so-called Stevens publications and certain Stevens formulae and the Hadfield Patent No. 1,252,001. These publications, as well as the Hadfield patent, taught that in the use of China-wood oil a wrinkle was to be avoided. Wrinkle was recognized as a defect; not something to be developed.

Each claim of the Hadfield patent is for "a process for controlling the crystalline structure, color and hardness of decorative surfaces coated with varnish and like fluids." This patent is for a "crystalline" structure made by the treatment of the composition in nitric acid vapor or its equivalent. The specifications recite that the invention relates to a process by which "the crystalline structure, color and hardness of the surface can be modified." It recites that "The essence of the invention consists of treating the varnished surface with nitric acid vapor or equivalent vapors capable of producing crystalline structure, color and hardness or any of them, at temperatures not exceeding 120 degrees centigrade * * *." The specifications recite that it is known that some varnishes which contain China-wood oil will yield a more or less crystalline surface when "stoved in an ordinary internally heated gas oven." The reference to prolonged baking in pure air in one part of the specification is not material because it is directed to a crystalline composition and further prolonged baking is just opposite to the teaching of Root. The diagrams picture a finish of crystalline surface formation. It is clear from the evidence that prior to Root this crystalline finish was well known in the art. Atwater-Kent substituted a wrinkle finish for the crystalline finish. Harrison refused the use of crystalline finish. The differences in composition, in appearance, process of making and of baking are clearly distinguishable. Hadfield omits or uses little drier. Root includes a powerful dose as essential to secure a wrinkle finish. Hadfield uses a low volatile solvent. Root teaches the use of rapidly evaporating high volatile solvents. "Crystal" in Hadfield is formed by the nitric acid vapor affecting the wet surface, and Root makes his wrinkle by another method. Hadfield is not a pertinent reference either as anticipating Root or as prior art or reference warranting a limitation of the Root claims.

VIII. In addition to the Hadfield patent, the defendant introduced in evidence, as anticipating Root, numerous patents relating to varnish finishes as applied to numerous articles of manufacture and some of these patents do show the use of certain of the parts of the Root composition in the making of these finishes. None of these, however, show the composition or a proc-

ess or an article of manufacture to which there is a wrinkle finish corresponding to the Root finish. None of the 17 patents, save Hadfield, are discussed in defendant's briefs.

IX. The publications upon which the defendant mainly relies as showing anticipation are Stevens on Patents, Vol. 1, part 1, Ed.1914, a reference book for the oil and varnish industry; the publication of Stevens called "China Wood Oil Formulae", Ed.1924; and articles in Chenische Umschau (Stuttgart) (1924). The characteristic properties of China-wood oil (tung-oil or wood oil) are comprehensively described in these publications, and numerous of these formulae lay down the method of its use in a composition with other materials to make a varnish or finish. It is uncontradicted that these publications and patents show the suitability of China-wood oil as a constituent of varnish and its use as a substitute for linseed oil. These publications and formulae teach the making of a varnish to be applied to the metal or other surface which may have a rough, smooth or crystalline or other form of surface. These publications treat China-wood oil, as has been described in this suit, as a "bad actor." None of these publications show a surface formation such as does Root. They treat any irregular or a wrinkle surface as something to be avoided rather than obtained. It is shown that there is not one of these publications or these formulae which teaches the objective of the getting a wrinkle finish such as the one here in suit and the method of its composition. It is claimed that by combining different elements in different formulae anticipation is to be found. It is not believed that this is the law. Respro, Inc., v. Vulcan Proofing Co., D.C., 1 F.Supp. 45; West v. Premier Register Table Co., 1 Cir., 27 F.2d 653; Badische Anilin, etc., v. Kalle, C.C., 94 F. 163. Defendant's expert testified that no one of the Stevens formulae taught how to get a uniform wrinkle finish. He also testified that the Stevens formula 602 was as close as any. Formula 602 is for a "Black magneto finish paint." This is described as a black paste, and it is mixed with various other products to make what is defined in formula No. 565 as "mixed black magneto finish paint." The result of the tests under these formulae was a smooth panel. Formula 602 has no resin. There is no teach-

ing for the use of a solvent in cutting the paste. It is not used as a baking varnish. Formula 601 to which considerable attention has been directed specifies 100 pounds of rosin and includes no resin and is not comparable in other respects with Root. It does not produce a wrinkle finish. Nothing is, therefore, seen in these publications as anticipating the Root finish. Further, the Stevens formulae were cited in the Patent Office as against Patent No. 1,732,661.

X. It is claimed that the claims of the patent in suit are too broad and read on the prior art with no disclaimer entered concerning a "crystal finish." Sufficient has been shown that the wrinkle finish claims do not cover the crystal finish. It is clear that there is a specific difference between wrinkle finish and the crystal or crystalline finish. Vide Revise & Caesar on "Patentability and Validity", § 195, page 355; Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177. The claims are not too broad.

XI. There is much evidence going to show that the second Root patent contains a sufficient disclosure to meet the requirements of Rev.Stat. § 488, 35 U.S. C.A. § 12. The claims are to be read in connection with the specification. Carl Braun, Inc., v. Kendall-Lamar Corp., 2 Cir., 116 F.2d 663; Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721. The principal criticism directed to the patents in this regard is that the patents do not give any indication of cooking procedure and that the cooking would have to be determined by trial. It is believed that the patent is sufficient in this respect. It is addressed to those skilled in the art. "It is enough that a patent so fully describes a process or a product that one reasonably skilled in the art may practice it or manufacture the product, and that others may know with reasonable certainty whether or not they are infringing the patent." Standard Paint Co. v. Bird, C.C., 175 F. 346, 356, affirmed, 2 Cir., 182 F. 1023; vide also American Stainless Steel Co. v. Ludlum Steel Co., 2 Cir., 290 F. 103; Catalin Corp. v. Catalazuli Mfg. Co., 2 Cir., 79 F.2d 593. It appears that the Pontiac Company had no difficulty in making the wrinkle finish under the direction of its president. A practical varnish maker would be able to determine the proper thickness of the coating and the viscosity. Indeed, the vice president of Pontiac, in speaking of these

features, testified that the second Root patent teaches the use of different thicknesses of film in order to control the degree of the coarseness or the fineness of the wrinkles; that regulation of the viscosity is taught to one skilled in the art. As was said in Seabury v. Am Ende, 152 U.S. 561, 14 S. Ct. 683, 684, 38 L.Ed. 553: "It is also to be observed that neither the defendant, in making the infringing article, nor the several witnesses of eminence in the medical profession, who testified * * * seem to have had any difficulty in understanding and applying the description contained in the patent." This whole question seems to go to the question of the regulation of the viscosity in the heating process and as to that it is believed that the patent is sufficient in its disclosure to one skilled in the art.

■■■ XII. It is urged as a defense that Root first secured a wrinkle finish through a mistake in formulation. It makes no difference whether the discovery was through mistake. The question is whether there was discovery of something patentable. It is quite certain that many inventions have been discovered through accident or mistake. "The law draws no distinction between those operations of the creative faculties which may result from long consideration, study and experiment, and those which reach their end by sudden intuition, accident, or from a flash of thought." Walker on Patents, Deller Ed. Vol. 1, pages 114, 115. Also Radiator Specialty Co. v. Buhot, 3 Cir., 39 F.2d 373; Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527.

XIII. The "wrinkle" finish, as applied to this composition, has acquired a special meaning, and "wrinkle" is here not merely descriptive of the function of a coating composition. This is shown by the distinction made in the proof between the "wrinkle" finish of Root and the references and exhibits in the case. Vide International Cork Co. v. New Process Cork Co., 2 Cir., 6 F.2d 420; Rajah Auto Supply Co. v. Belvidere Screw & Mach. Co., 7 Cir., 275 F. 761; Strong-Scott Mfg. Co. v. Weller, 8 Cir., 112 F.2d 389, and many other authorities to the same effect.

As stated, most of the varnish manufacturers are licensees under the Root patents. There is some proof that Pontiac sells its composition at some lower price than do the licensees under these patents. Defendant urges that the monopoly under these patents is responsible for the greatly increased sales of the product and that such increased sales do not show any direct recognition of the patents of the ultimate users. This position seems unsound. If the consumer desired a "crystalline" or other un-patented composition, these lessees could have furnished this without the payment of royalties. The making of "crystalline" finish practically ceased when "wrinkle" came in. That shows popular selection. We are not here concerned with the question of any monopoly in the sale of the composition. Indeed, as admitted by the defendant, the illegality of any license scheme is not a defense to charge here. That rests upon other issues than those presented here.

The exhibits in this case number in the hundreds. They include many samples of a finish product upon an article of manufacture claimed to have been made and baked in accordance with the patent process in suit and many purported to follow the formulae in the prior art. It has been demonstrated to the satisfaction of the court that the patent composition, when applied under the condition set forth in the second patent, makes a finish that is uniform and which is definitely different in appearance from anything shown in the prior art. Root corrected the defects in the prior products and avoided the difficulty therein appearing. It has been made to appear that finishes showing variety in appearance can be made by a composition of China-wood oil, resin and other component parts and that these were made before Root but patentability here lies in the new and novel feature of definite component parts to make a uniform wrinkle finish.

XIV. It appears that defendant Fritz was never notified of any claim of infringement by him prior to bringing of this suit.

XV. Pontiac assumed the defense of this suit on behalf of Fritz.

It is found and decided that:

■■■ 1. Defendant Fritz infringed Claims 1 and 2 of Patent No. 1,732,661 and Claims 5, 6, 7, 9, 10 and 19 of Patent No. 1,896,594.

■■■ 2. Defendant Fritz infringed Claims 1, 2, 4 and 22 of Patent No. 1,896,- 594.

3. Defendant does not infringe Claims 13, 14, 23, 24, 25, 26, 27 and 28 of Patent No. 1,896,594.

4. Plaintiff is entitled to judgment enjoining and restraining the defendant Fritz from further infringment.

5. No costs are allowed.

6. No accounting is necessary.

7. Findings to accord herewith may be submitted.