## RICKER v. GENERAL ELECTRIC CO.
### No. 212, Docket 20492.

Circuit Court of Appeals, Second Circuit.

June 3, 1947.

Gustave A. Gerber, of New York City, for plaintiff-appellant.

Charles H. Walker, of New York City, for defendant-appellee.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

---

CLARK, Circuit Judge.

■ This action involves the alleged plagiarism of scientific materials simply prepared for the lay reader. Plaintiff charges that before March, 1942, she produced an original book entitled, "Radio Operator's Primer," which was then copyrighted; that prior to April, 1943, she wrote a revised edition of this book entitled, "Radio Primer," which was copyrighted October 8, 1943; that in April, 1943, she offered her already copyrighted first book and the manuscript of her second book to defendant, who returned them to her without acceptance of the offer; and that these are infringed by defendant's publication, "The ABC's of Radio" (shown by other matter of record to have been published on July 12, 1943). She sought the usual remedies of injunction, accounting, and damages. The record, in addition, contains the defendant's answer of denial and the various affidavits which will be referred to below. Since the District Court has granted summary judgment for defendant on the latter's motion, and since an issue of fact not triable on this motion is raised on the pleadings as to access, we must decide the present appeal upon the basis that plaintiff will be able to prove her allegations as to access.

■ Unlike the subject matter of a patent, copyrighted material need be not new, but only original. Hence the sole issue before us is as to infringement. And in considering that issue it must be remembered that the plaintiff has no monopoly of the scientific information with which her book deals; nor has she a monopoly of the idea of expounding such information in simple language comprehensible by lay readers. All her copyright gives her is the right to prevent plagiarism. Independent reproduction of a copyrighted work is not infringement; only plagiarism will serve. Arnstein v. Edward B. Marks Music Corp., 2 Cir., 82 F.2d 275; Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49, 54. Where access is proved, or assumed as in the case at bar, likenesses between the copyrighted work and the putative piracy may give rise to an inference of plagiarism; but such an inference is necessarily greatly weakened when the sim-ilarities relate to the expression of scientific principles which must necessarily be stated in more or less stereotyped language. See Oxford Book Co. v. College Entrance Book Co., 2 Cir., 98 F.2d 688, 691. Bearing these principles in mind we have examined the record and have found no similarities which could support the charge of plagiarism.

■ Plaintiff's affidavits show that she is a person of experience in the field of radio communication, beginning her study of wireless telegraphy in World War I. In World War II, she endeavored to stimulate the study of radio by women and adapted a course to meet army requirements for radio work, writing the first book here involved to cover the material for the course. This she gave in the Women's Defense School in Washington. She was also engaged to teach the theories of radio to the men of the Army Air Corps, Technical Training Command. The purposes of the book thus indicated are borne out in her preface, where she speaks of the need of radio operators, the call by the armed forces for amateurs to enroll and learn commercial work, and the hope that "old and new 'Hams' [amateur radio senders] will understand and like my angle on this fascinating study." In line with this purpose her work starts with the teaching of the Morse Code and contains abbreviated signals for stereotyped questions and answers before she proceeds to expound her theoretical material such as "What Is Electricity?" "What Is A Battery?" and so on. Then at page 24 of the 32-page multigraphed pamphlet she comes back again to a detailed discussion of transmitters, followed by several pages of quotation of "F. C. C. Questions and answers" and a final page of "Federal Communications Commission's Rules." The pointed direction of this material to the needs of radio operators of communication sets is obvious.

In her 1943 work, "Radio Primer," this is less stressed, and perhaps the appeal may be considered widened; her preface here suggests, "Engineers may find it refreshing to review their ABC's, new or old hams to rechase the fascinating electron and remarvel at its mysterious power." This,

however, is essentially a work stressing definitions which are short, terse, and direct. The subjects of the definitions appear in capitals as the first word or words of each short paragraph. The emphasis upon transmission is still found, however, in the chapters beginning at page 34 of this 48-page pamphlet, including the last chapter at page 43, entitled, "Answers to FCC Amateur B License Examination."

Defendant's work of 68 pages, double columns, according to its preface, "is the outgrowth of a training course in radio that was prepared for sales personnel and others employed in non-technical positions in the radio industry." Particular emphasis is then given to an understanding of "the servicing of receivers," so that "the point of view of the practical serviceman has been adopted rather than that of the advanced engineer." Thus we find stress on symbols and abbreviations for vacuum tubes and other radio parts, with detailed attention (beginning at page 47) to "Trouble Analyzing and Repairing," setting forth methods, devices, systems, and diagrams for discovering faults in tubes, in loudspeakers, in the power supply, in the power amplifier, etc., etc. There is an extensive discussion, with drawings, of the General Electric 6-tube superheterodyne Model L-630. Finally there follow seven pages of terms and definitions. There is no discussion of transmitters, or the Morse Code, or the Federal Communications Commission's requirements for operators' licenses; and there is no material at all dealing with the sending of signals. Hence here the pointed direction of the text to radio receivers and their care and servicing is obvious.

Defendant's affidavit made by one Royer asserts that he prepared the final draft of defendant's book, making use of material previously prepared by him for sales training within the company and published in mimeographed form under date of October 27, 1942. An inspection of this material attached as an exhibit demonstrates beyond doubt that it is the source of by far the greater part of defendant's publication. Almost all the Royer manuscript is lifted bodily into the final publication, with only minor revision and with some additions.

Among these additions are the definitions referred to above, which Royer asserts were taken from defendant's "Radio Operators' Manual," Fourth Edition, published and copyrighted in 1939—a fact which is also demonstrated by inspection. In addition, Royer asserts that his manuscript was a revision and an expansion of a mimeographed text of a lecture course on radio started in the Bridgeport Trade School in 1941 by one Lippert, another employee of defendant. Lippert's affidavit, also included, states that his lectures were given commencing March 10, 1941; and he supplies as an exhibit a photostat of the mimeographed lectures. Here, too, inspection shows the direct copying which the affidavits assert. In other words, substantial bodies of material can be traced directly from the Lippert manuscript to the Royer manuscript to defendant's publication. Both Lippert and Royer deny any use, or even knowledge, of any of plaintiff's material.

It will be seen, therefore, that plaintiff's case turns upon the claimed copying of small details of textual exposition of scientific data. This, then, is the substantial point of plaintiff's claim, which in her affidavits she backs up with detailed comparisons of quoted material, listing, indeed, in her main charge some 108 claimed instances of copying. True, she does suggest that her purpose of conveying scientific radio information in simple form to the layman and her methods of carrying out her purpose were copied. But as we have pointed out above, since her general approach to the subject is quite different from defendant's, and since there can be no monopoly in attempting to bring science to the layman, it is clear that these individual instances of asserted copying constitute the nub of the case.

As pointed out in the Oxford Book case, supra, 2 Cir., 98 F.2d 688, it would not be strange under the circumstances to find some instances of duplication of the same scientific data. We have, however, examined with care all the material plaintiff has supplied, and are bound to say that proof of copying is actually nonexistent. In fact we are impressed with the amount of difference of statement which is still possible in dealing with standard scientific

materials. Apparently her view is that the variations are due to defendant's shrewdness in disguising its clever copying. But the nature of the difference in expression leads us to believe that such an explanation is beyond the bounds of all probability. Rather the comparisons indicate only different approaches to the same body of scientific material.

In view of the amount of copying alleged by plaintiff, it seems to us no more worth while than it did to the court in the Oxford Book case to try to analyze in detail each claimed instance. Perhaps a few references may show the grounds of our conclusion. It is to be noted that plaintiff, with that "obsessive conviction" that all similarities are inevitably plagiarism so frequent among authors, Dellar v. Samuel Goldwyn, Inc., 2 Cir., 150 F.2d 612, 613, in actual fact has manipulated the materials to demonstrate her convictions. Thus, by a judicious process of selection of words extracted from sentences and from the surrounding context, she finds some repetitive expressions. Needless to say, this method is not convincing. An example may indicate what comes to be an almost inveterate practice among her various instances. Thus she quotes from her first work, "Remember * * * thousands of these electrons moving," and matches it with two selections from different pages of defendant's book: "It should be remembered * * * and "Travel thousands of miles * * * moving procession of electrons * * * millions of electrons." We

quote in the margin the full sentences, of which these are only selected parts; even thus torn from their context they show the tortured compression necessary to get any semblance of copying, not to speak of the implied taboo on the use of the ordinary word "remembered."[1]

Again, as showing the emphasis upon a word, plaintiff quotes, as "original to me," her Radio Primer definition, "Electricity is supposed to be an *unbalanced* condition of atoms." What she is trying to say cannot be considered original; the thought appears even in the ordinary dictionary, *cf.* Webster's New International Dictionary, 1939, tit. "electricity." But she finds copying in defendant's statement, "What happens as a result of this unbalance is the basis for electrical theory." On the other hand, defendant's full statement, quoted in the margin,[2] is a clear and simple expression of the electron theory, where the unoriginal dictionary word "unbalance" ("want of balance," according to Webster) certainly has no sinister significance.

Again she appears to stress similarities of definitions where equations are stated, as for instance her "$E \times I$: Watts," as compared to defendant's "$W = I \times E$," following standard, though not identical, definitions of the electrical term "watt." But even the dictionary defines a watt in terms of pressure and current, and there can be no reasonable inference of plagiarism in using standard symbols to say merely that power in watts equals pressure in volts times current in amperes. Another illustration

---

[1] "Remember, there are thousands of these electrons moving at the same spot at the same time, for there are many molecules and more than one electron is magnetized from each atom at once." Radio Operator's Primer, 1942, p. 4.

"It should be remembered that all waves carry energy or power." The ABC's of Radio, 1943, p. 7.

"Scientists have propounded a theory to explain electricity, called the electron theory. This states that all substances are made up of tiny particles of negative electricity called electrons, which can travel at many thousands of miles per second. An electric current is a moving procession of electrons. Their size is so small that millions of electrons are required to heat the filament of a flashlight bulb." Id. p. 8.

Perhaps an even more flagrant example, too long for quotation, is No. 10, set forth at length in defendant's brief.

[2] "The nucleus of an atom is made up of negative and positive charges, the positive charge predominating. Whirling around this nucleus are still more electrical charges called electrons. These electrical charges on an atom are usually electrically balanced, with some of the electrons tightly bound to the nucleus while others readily respond to an outside influence and can be broken away. When an electron is broken away from an atom, the atom's balance is disturbed and what happens as a result of this unbalance is the basis for electrical theory." The ABC's of Radio, p. 8.

may be found in the various references to Ohm's Law, which defendant, The ABC's of Radio, page 9, introduces with a bit of background, viz: "Ohm early in the 19th century discovered that the ratio of the pressure to the current in a given circuit is constant. This is the fundamental law of the flow of electrical currents." Then follows the formula:

$$R = \frac{E}{I}$$

"where R = resistance in ohms
E = pressure in volts
I = current in amperes."

This equation appears in plaintiff's first work with a different introduction as "a very important law which you must learn." Radio Operator's Primer, page 4. And in her second work, in the chapter on Ohm's Law following her statement in terms of pure definition: "ONE VOLT WILL PRESS 1 AMPERE THROUGH 1 OHM OF R." (All in capitals.) Radio Primer, page 6. But how better may one express this now simple, but basic, principle of physics than by using the usual symbols?

We realize that any discussion short of a meticulous exposition of each of her instances is likely to be thought unfair to an author convinced that she is the victim of literary theft. But our examples, chosen not as more striking than others (they are not), but partly because of references by the parties, partly because their conciseness permits of their use without so extensive quotations as others require, are of an exact piece, in our analysis, with all the rest and with her claim as a whole. Since (except so far as discussed below) she has stressed none of her 108 contentions more than others, we feel justified in the conclusion from our examination that no more forceful or persuasive proofs of plagiarism appear than those we have cited. Indeed, a sampling test indicates that for at least most, possibly all, of the basic definitions here used by both parties the source is well known not merely in the usual sci-entific texts, but even in the pages of a modern ordinarily complete dictionary!

There are, however, two matters deserving further discussion because of a possibly greater emphasis discernible as to them in her affidavits. The first appears because, in an obvious attempt to meet the difficulties suggested by the early dates of publication of the Lippert and Royer texts, she adds to her "Exhibit A" of the 108 instances of copying two further exhibits of duplicating, but specially classified, instances. The first, Exhibit B, comprises 19 instances of claimed copying from her pamphlets in both defendant's work and the Royer manuscript. The second, Exhibit C, contains 22 instances where, as she asserts, her material appears in defendant's book, but not in the Royer manuscript. If conviction is possible anywhere, it should be afforded, it seems, from this last exhibit. But actually it, as well as the companion Exhibit B, contains the same form of tortured argumentation which we find in the earlier instances; indeed, the reference to the equation for the watt discussed above comes from Exhibit C.

The other matter concerns her claim that defendant has copied a substantial error she has made. This is perhaps her most important contention, and should be decisive if sustained. As she states it, in her first book she set forth the older or "current" theory of electricity, where electricity is supposed to flow as a current from the positive to the negative terminals of the power supply. Discovering her mistake, she corrected it in her second work to state the electron theory, wherein electrons move in the opposite direction from the negative to the positive sides of the source. But since in defendant's work both theories appear, the argument runs that one must have been taken from plaintiff's earlier work and the other from her later work. If an expert answer is needed as to a development of theoretical reasoning which again is shown in the ordinary dictionary,[3] it is furnished by Lippert in his reply

---

[3] Cf. Webster's New International Dictionary, 1939, tit. "atomic theory"; "current"; "electricity"; "electron"; "nucleus," etc. A quite complete discussion of both these theories, now so well known for half a century or more, as well as of the other matters herein referred to, may be found in such a generally available source as the Encyc. Brit., 14th Ed. 1929, as under the titles "electricity," "electron," and "nucleus."

affidavit on this point. He asserts that there is no mistake in the work, that the situation as to theory is stated therein, and that it is useful, and not misleading, to use the older conventional references to electric current for description of many of the simpler principles and "the more accurate method of analysis" of the electron theory to describe the more complex vacuum tubes.[4] He adds that the forms of expression employed by defendant are so unlike those of plaintiff as to show no copying— a point demonstrated to be quite well taken on comparison of the statements themselves. Plaintiff in her reply affidavit concedes the essential point of the two theories concerning flow of current of electricity, and otherwise only revoices her suspicions. The whole incident supplies altogether too slight a basis to afford conviction that defendant General Electric's basic views of electricity were changed by the impact upon it of plaintiff's writings. But the fact that she could so vigorously make this claim demonstrates both the depth of her convictions of defendant's alleged thievery, as well as the tenuity of the basis she has offered for them.

Judgment affirmed.

---

[4] As stated in defendant's work at p. 29, which also contains a diagram of a "half-wave rectifier" showing both the " 'current' flow" and the opposite "electron flow." Explicit statements had appeared earlier in the Royer text, p. 3, and in the Lippert text, p. 2.