## ALFRED BELL & CO. Ltd. v. CATALDA FINE ARTS, Inc. et al.

### No. 271, Docket 21599.

United States Court of Appeals, Second Circuit.

Argued June 7, 1951.

Decided July 20, 1951.

See also 74 F.Supp. 973.

38. See 2 Schouler, Marriage, Divorce, Separation and Domestic Relations, § 1086 (6 ed. 1921).

Guggenheimer & Untermyer, New York City (Abraham Shamos, Rudolph E. Uhlman and William J. Cohen, all of New York City, of counsel), for plaintiff.

Ehrich, Royall, Wheeler & Holland, New York City (James G. Holland and Robert A. Roth, New York City, of counsel), for United States Printing & Lithograph Co.

. Purdy & Lamb, New York City (Edmund F. Lamb and Anthony B. Cataldo, New York City, of counsel), for Catalda Fine Arts, Inc. and Michael F. Catalda.

Before CHASE, CLARK and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. Congressional power to authorize both patents and copyrights is contained in Article 1, § 8 of the Constitution.[1]  In passing on the validity of patents, the Supreme Court recurrently insists that this constitutional provision governs. On this basis, pointing to the Supreme Court's consequent requirement that, to be valid, a patent must disclose a high degree of uniqueness, ingenuity and inventiveness, the defendants assert that the same requirement constitutionally governs copyrights. As several sections of the Copyright Act—e. g., those authorizing copyrights of "reproductions of works of art," maps, and compilations—plainly dispense with any such high standard, defendants are, in effect, attacking the constitutionality of those sections. But the very language of the Constitution differentiates (a) "authors" and their "writings" from (b) "inventors" and their "discoveries." Those who penned the Constitution,[2] of course, knew the difference. The pre-revolutionary English statutes had made the distinction.[3] In 1783, the Continental Congress had passed a resolution recommending that the several states enact legisla-

---

1. "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries".

2. Many of them were themselves authors.

3. The Act of Anne 8, c. 19, was entitled "An Act for the encouraging of learning,. by vesting of the copies of printed books in the authors or purchasers of such copies, during the times therein mentioned."

The previous history shows the source of the word "copyright." See 1 Laddas, The International Protection of Literary and Artistic Property (1938) 1b:

"In England, the royal grants of privilege to print certain books were not copyrights. They were not granted to encourage learning or for the benefit of authors; they were commercial monopolies, licenses to tradesmen to follow their calling. As gradually monopolies became unpopular, the printers sought to base their claims on other grounds, and called

tion to "secure" to authors the "copyright" of their books.[4] Twelve of the thirteen states (in 1783–1786) enacted such statutes.[5] Those of Connecticut and North Carolina covered books, pamphlets, maps, and charts.[6]

Moreover, in 1790, in the year after the adoption of the Constitution, the first Congress enacted two statutes, separately dealing with patents and copyrights. The patent statute, enacted April 10, 1790, 1 Stat. 109, provided that patents should issue only if the Secretary of State, Secretary of War and the Attorney General, or any two of them "shall deem the invention or discovery sufficiently useful and important"; the applicant for a patent was obliged to file a specification "so particular" as "to distinguish the invention or discovery from other things before known and used * * *"; the patent was to constitute *prima facie* evidence that the patentee was "the first and true inventor or * * * discoverer * * * of the thing so specified."[7] The Copyright Act, enacted May 31, 1790, 1 Stat. 124, covered "maps, charts, and books". A printed copy of the title of any map, chart or book was to be recorded in the Clerk's office of the District Court, and a copy of the map, chart or book was to be delivered to the Secretary of State within six months after publication. Twelve years later, Congress in 1802, 2 Stat. 171, added, to matters that might be copyrighted, engravings, etchings and prints.

Thus legislators peculiarly familiar with the purpose of the Constitutional grant, by statute, imposed far less exacting standards in the case of copyrights. They authorized the copyrighting of a mere map which, patently, calls for no considerable uniqueness. They exacted far more from an inventor. And, while they demanded that an official should be satisfied as to the character of an invention before a patent issued, they made no such demand in respect of a copyright. In 1884, in Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 57, 4 S.Ct. 279, 28 L.Ed. 349, the Supreme Court, adverting to these facts said: "The construction placed upon the constitution by the first act of 1790 and the act of 1802, by the men who were contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight, and when it is remembered that the rights thus established have not been disputed during a period of nearly a century, it is almost conclusive." Accordingly, the Constitution, as so inter-

---

the 'right of copy' not a monopoly, but a property right. The Stationers Company had a register in which its members entered the titles of the works they were privileged to print. A custom developed by which members refrained from printing the books which stood on the register in the name of another. Thus members respected each other's 'copy,' as it was called, and there grew up a trade recognition of 'the right of copy' or copyright. This right was subsequently embodied in a by-law of the Stationers Company. The entry in the register was regarded as a record of the rights of the individual named, and it was assumed that possession of a manuscript carried with it the right to print copies." See also Sheavyn, The Literary Profession in the Elizabethan Age (1909) 52–53, 64–65, 70–71, 76–80

4. See Bulletin No. 3 (1900) of Library of Congress, Copyright Office.

5. Ibid. 11–31.

6. It is of interest that the statutes of Connecticut, South Carolina, Georgia and New York contained this provision: If on the complaint of a person, a court found that the author or proprietor had neglected to furnish the public with sufficient editions of a copyrighted work, or had offered the work for sale at an unreasonable price, the court should enter an order requiring the offering, within a reasonable time, of a sufficient number at a reasonable price determined by the court; if there was non-compliance, the court was authorized to give the complainant a license to publish the work in such numbers and on such terms as the court deemed just and reasonable. The North Carolina statute was somewhat similar in this respect.

7. See Jefferson's remarks on the strict criteria of invention used by the Secretarial "patent board," in a letter of August 13, 1813, to Isaac McPherson, reprinted in Padover, The Complete Jefferson (1943) 1011 at 1016.

preted, recognizes that the standards for patents and copyrights are basically different.

■■ The defendants' contention apparently results from the ambiguity of the word "original." It may mean startling, novel or unusual, a marked departure from the past. Obviously this is not what is meant when one speaks of "the original package," or the "original bill," or (in connection with the "best evidence" rule) an "original" document; none of those things is highly unusual in creativeness. "Original" in reference to a copyrighted work means that the particular work "owes its origin" to the "author."[8] No large measure of novelty is necessary. Said the Supreme Court in Baker v. Selden, 101 U.S. 99, 102–103, 25 L.Ed. 841: "The copyright of the book, if not pirated from other works, would be valid without regard to the novelty, or want of novelty, of its subject-matter. The novelty of the art or thing described or explained has nothing to do with the validity of the copyright. To give to the author of the book an exclusive property in the art described therein, when no examination of its novelty has ever been officially made, would be a surprise and a fraud upon the public. That is the province of letters-patent, not of copyright. The claim to an invention or discovery of an art or manufacture must be subjected to the examination of the Patent Office before an exclusive right therein can be obtained; and it can only be secured by a patent from the government. The difference between the two things, letters-patent and copyright, may be illustrated by reference to the subjects just enumerated. Take the case of medicines. Certain mixtures are found to be of great value in the healing art. If the discoverer writes and publishes a book on the subject (as regular physicians generally do), he gains no exclusive right to the manufacture and sale of the medicine; he gives that to the public. If he desires to acquire such exclusive right, he must obtain

a patent for the mixture as a new art, manufacture, or composition of matter. He may copyright his book, if he pleases; but that only secures to him the exclusive right of printing and publishing his book. So of all other inventions or discoveries."

In Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 250, 252, 23 S.Ct. 298, 47 L.Ed. 460, the Supreme Court cited with approval Henderson v. Tompkins, C.C., 60 F. 758, where it was said, 60 F. at page 764: "There is a *very broad distinction between what is implied in the word 'author,' found in the constitution, and the word 'inventor.' The latter carries an implication which excludes the results of only ordinary skill, while nothing of this is necessarily involved in the former.* Indeed, the statutes themselves make broad distinctions on this point. So much as relates to copyrights * * * is expressed, so far as this particular is concerned, by the mere words, 'author, inventor, designer or proprietor,' with such aid as may be derived from the words 'written, composed or made,' * * *. But *a multitude of books rest safely under copyright, which show only ordinary skill and diligence in their preparation.* Compilations are noticeable examples of this fact. With reference to this subject, the courts have not undertaken to assume the functions of critics, or to measure carefully the degree of originality, or literary skill or training involved."[9]

■■ It is clear, then, that nothing in the Constitution commands that copyrighted matter be strikingly unique or novel. Accordingly, we were not ignoring the Constitution when we stated that a "copy of something in the public domain" will support a copyright if it is a "distinguishable variation";[10] or when we rejected the contention that "like a patent, a copyrighted work must be not only original, but new", adding, "That is not * * * the law as is obvious in the case of maps or compendia, where later works will necessarily be anticipated."[11] All that is needed

8. Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 57–58, 4 S.Ct. 279, 281, 28 L.Ed. 349.

9. Emphasis added.

10. Gerlach-Barklow Co. v. Morris & Bendien, 2 Cir., 23 F.2d 159, 161.

11. Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49, 53. See also

to satisfy both the Constitution and the statute is that the "author" contributed something more than a "merely trivial" variation, something recognizably "his own." [12] Originality in this context "means little more than a prohibition of actual copying." [13] No matter how poor artistically the "author's" addition, it is enough if it be his own. Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 250, 23 S.Ct. 298, 47 L.Ed. 460.

■■ On that account, we have often distinguished between the limited protection accorded a copyright owner and the extensive protection granted a patent owner. So we have held that "independent reproduction of a copyrighted * * * work is not infringement", [14] whereas it is *vis a vis* a patent. Correlative with the greater immunity of a patentee is the doctrine of anticipation which does not apply to copyrights: The alleged inventor is chargeable with full knowledge of all the prior art, although in fact he may be utterly ignorant of it. The "author" is entitled to a copyright if he independently contrived a work completely identical with what went before; similarly, although he obtains a valid copyright, he has no right to prevent another from publishing a work identical with his, if not copied from his. A patentee, unlike a copyrightee, must not merely produce something "original"; he must also be "the first inventor or discoverer." [15] "Hence it is possible to have a plurality of valid copyrights directed to closely identical or even identical works. Moreover, none of them, if independently arrived at without copying, will constitute an infringement of the copyright of the others." [16]

Ricker v. General Electric Co., 2 Cir., 162 F.2d 141, 142.

12. Chamberlin v. Uris Sales Corp., 2 Cir., 150 F.2d 512; cf. Gross v. Seligman, 2 Cir., 212 F. 930.

13. Hoague-Sprague Corp. v. Frank C. Meyer, Inc., D.C.N.Y., 31 F.2d 583, 586. See also as to photographs Judge Learned Hand in Jewelers Circular Publishing Co. v. Keystone Pub. Co., D.C.N.Y., 274 F. 932, 934.

The English doctrine is the same. See Copinger, The Law of Copyrights (7th ed. 1936) 40-44: "Neither original thought nor original research is essential"; he quotes the English courts to the effect that the statute "does not require that the expression must be in an original or novel form, but that the work must not be copied from another work—that it should originate from the author," but only that "though it may be neither novel or ingenious, [it] is the claimant's original work in that it originates from him, and is not copied."

14. Arnstein v. Edward B. Marks Music Corp., 2 Cir., 82 F.2d 275; Ricker v. General Electric Co., 2 Cir., 162 F.2d 141, 142.

15. See Admur, Copyright Law and Practice (1936) 70.

16. Id. See Lawrence v. Dana, 15 Fed.Cas. 26, 60, No. 8,136: "Persons making, using, or vending to others to be used, the patented article are guilty of infringing the letters-patent, even though they may have subsequently invented the same thing without any knowledge of the existence of the letters-patent; but the re-composition of the same book without copying, though not likely to occur, would not be an infringement." See also Fred Fisher, Inc. v. Dillingham, D.C.N.Y., 298 F. 145, 147.

The English doctrine is the same. See Copinger, The Law of Copyrights (7th ed. 1936) 2: "It is not infrequently urged as an objection to granting copyright protection for a long term that the effect is to create a monopoly, but at least, it is not a monopoly of knowledge. The grant of a patent does prevent full use being made of knowledge, but the reader of a book is not by the copyright laws prevented from making full use of any information he may acquire from his reading. He is only prohibited from disseminating that information or knowledge by multiplying copies of the book or of material portions of it: or, possibly, by reading the book aloud in public. Copyright is, in fact, only a negative right to prevent the appropriation of the labours of an author by another. If it could be shown that two precisely similar works were in fact produced wholly independently of one another, the author of the work that was published first would have no right to restrain the publication by the other author of that author's independent and original work. A patentee, on the other hand, has the right to prevent another from using his invention if it in fact infringes the former's

The difference between patents and copyrights is neatly illustrated in the design patent cases.[17] We have held that such a patent is invalid unless it involves, "a step beyond the prior art", including what is termed "inventive genius." A. C. Gilbert Co. v. Shemitz, 2 Cir., 45 F.2d 98, 99. We have noted that, as in all patents, there must be a substantial advance over the prior art. Neufeld-Furst & Co. v. Jay-Day Frocks, 2 Cir., 112 F.2d 715, 716. We have suggested that relief for designers could be obtained if they were permitted to copyright their designs, and that, until there is an amendment to the copyright statute, "new designs are open to all, unless their production demands some salient ability." Nat Lewis Purses v. Carole Bags, 2 Cir., 83 F.2d 475, 476. We have noted that if designers obtained such a statute, it would give them "a more lim-ited protection and for that reason easier to obtain. * * *" White v. Leanore Frocks, Inc., 2 Cir., 120 F.2d 113, 115.[18]

2. We consider untenable defendants' suggestion that plaintiff's mezzotints could not validly be copyrighted because they are reproductions of works in the public domain. Not only does the Act include "Reproductions of a work of art",[19] but—while prohibiting a copyright of "the original text of any work * * * in the public domain" [20]—it explicitly provides for the copyrighting of "translations, or other versions of works in the public domain".[21] The mezzotints were such "versions." They "originated" with those who made them, and—on the trial judge's findings well supported by the evidence—amply met the standards imposed by the Constitution and the statute.[22] There is evidence that

patent, notwithstanding that the latter's invention was the subject of independent investigation on his part."

17. 35 U.S.C.A. § 73 requires that for a design patent the design shall be "not known or used by others in this country before" the "invention thereof, and not * * * described in any printed publication in this or any foreign country before" the "invention thereof."

18. See also Stein v. Export Lamp Co., 7 Cir., 188 F.2d 611, 612–613.

19. 17 U.S.C. § 5.

20. 17 U.S.C. § 8 (formerly § 7).

21. 17 U.S.C. § 7 (formerly § 6).
See Judge Learned Hand in Fred Fisher, Inc. v. Dillingham, D.C., 298 F. 145, 150–151: "Take, for example, two faithful compilations or translations. While it may be rare that they should be identical, obviously even that is possible over substantial parts. It could not be maintained that the earlier version destroyed the copyright of the later, and yet, if copyright be analogous to patents, this must result. Certainly, the labor of the second translator or compiler is not lost, so he do not use the work of the first.
"Directories constitute a familiar instance of such compilations. No one doubts that two directories, independently made, are each entitled to copyright, regardless of their similarity, even though it amount to identity. Each being the result of original work, the second will be protected, quite regardless of its lack of novelty. But the best instance is in the case of maps. Here, if each be faithful, identity is inevitable, because each seeks only to set down the same facts in precisely the same relations to each other. So far as each is successful, each will be exactly the same. While I know no case which involves the point, Bowker says on page 255 (Copyright, Its History and Law):
" 'Two map makers, collecting at first hand, would naturally make the same map, and each would equally be entitled to copyright. In this respect copyright law differs from patent law, where a first use bars others from the same field.' "
Judge Hand there also said at page 150 of 298 F.: "Any subsequent person is, of course, free to use all works in the public domain as sources for his compositions. No later work, though original, can take that from him. But there is no reason in justice or law why he should not be compelled to resort to the earlier works themselves, or why he should be free to use the composition of another, who himself has not borrowed. If he claims the rights of the public, let him use them; he picks the brains of the copyright owner as much, whether his original composition be old or new. The defendant's concern lest the public should be shut off from the use of works in the public domain is therefore illusory; no one suggests it. That domain is open to, all who tread it; not to those who invade the closes of others, however similar."

22. See Copinger, The Law of Copyrights (7th ed. 1936) 46: "Again, an engraver

they were not intended to, and did not, imitate the paintings they reproduced. But even if their substantial departures from the paintings were inadvertent, the copyrights would be valid.[23] A copyist's bad eyesight or defective musculature, or a shock caused by a clap of thunder, may yield sufficiently distinguishable variations.[24] Having hit upon such a variation unintentionally, the "author" may adopt it as his and copyright it.[25]

Accordingly, defendants' arguments about the public domain become irrelevant. They could be relevant only in their bearing on the issue of infringement, *i. e.,* whether the defendants copied the mezzotints.[26] But on the findings, again well grounded in the evidence, we see no possible doubt that defendants, who did deliberately copy the mezzotints, are infringers. For a copyright confers the exclusive right to copy the copyrighted work —a right not to have others copy it. Nor

were the copyrights lost because of the reproduction of the mezzotints in catalogues.[27]

3. We think the defendants did not establish the anti-trust "unclean-hands" defense: (1) The Guild's price-fixing provision was explicitly confined to Great Britain and Ireland, and did not affect sales in the United States. (2) As to the Guild agreement to restrict output,[28] there are these considerations: Of some 600 or 700 members, according to the testimony only "one or two" are in this country; for all that the slender proof shows, their participation in Guild activities may have been limited to the receipt of Guild catalogues; the plaintiff has no office or assets here, and there is no evidence that it acted here on behalf of the Guild. So far as the evidence discloses, the output restriction was not imposed with sales in the United States in mind. Accordingly, we take it that the restriction was meant

is almost invariably a copyist, but although his work may infringe copyright in the original painting if made without the consent of the owner of the copyright therein, his work may still be original in the sense that he has employed skill and judgment in its production. He produces the resemblance he is desirous of obtaining by means very different from those employed by the painter or draughtsman from whom he copies: means which require great labour and talent. The engraver produces his effects by the management of light and shade, or, as the term of his art expresses it, the *chiaroos-curo.* The due degrees of light and shade are produced by different lines and dots; he who is the engraver must decide on the choice of the different lines or dots for himself, and on his choice depends the success of his print."

23. See Kallen, Art and Freedom (1942) 977 to the effect that "the beauty of the human singing voice, as the western convention of music hears it, depends upon a physiological dysfunction of the vocal cords. * * * "

Plutarch tells this story: A painter, enraged because he could not depict the foam that filled a horse's mouth from champing at the bit, threw a sponge at his painting; the sponge splashed against the wall—and achieved the desired result.

24. Cf. Chamberlin v. Uris Sales Corp., 2 Cir., 150 F.2d 512 note 4.

25. Consider inadvertent errors in a translation. Compare cases holding that a patentable invention may stem from an accidental discovery. See, e. g., Radiator Specialty Co. v. Buhot, 3 Cir., 39 F.2d 373, 376; Nichols v. Minnesota Mining & Mfg. Co., 4 Cir., 109 F.2d 162, 165; New Wrinkle v. Fritz, D.C.W.D.N.Y., 45 F.Supp. 108, 117; Byerley v. Sun Co., 3 Cir., 184 F. 455, 456–457.

Many great scientific discoveries have resulted from accidents, *e.g.,* the galvanic circuit and the x-ray.

26. Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49, 54; Detective Comics, Inc. v. Bruns Publications, 2 Cir., 111 F.2d 432, 433.

27. Gerlach-Barklow Co. v. Morris & Bendien, 2 Cir., 23 F.2d 159, 163; Basevi v. Edward O'Toole Co., D.C., 26 F.Supp. 41, 49.

28. A copyright-owner, where he does not act in concert with others, may lawfully restrict his output and charge what prices he pleases, for there is no statutory provision forbidding such conduct.

That a statute might so forbid, see the legislation (cited in note 6, supra) of twelve of the states shortly before the addition of the Constitution.

to have, and did have, at most, only an incidental, peripheral, reference to sales in the United States of America.[29] All the foregoing is important since recently the Supreme Court, in similar contexts, has given the "unclean hands" doctrine a somewhat narrowed scope. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 214,[30] 71 S.Ct. 259. We have here a conflict of policies: (a) that of preventing piracy of coprighted matter and (b) that of enforcing the anti-trust laws. We must balance the two, taking into account the comparative innocence or guilt of the parties, the moral character of their respective acts, the extent of the harm to the public interest, the penalty inflicted on the plaintiff if we deny it relief. As the defendants' piracy is unmistakably clear, while the plaintiffs' infraction of the anti-trust laws is doubtful and at most marginal, we think the enforcement of the first policy should outweigh enforcement of the second.[31]

4. The trial judge did not "abuse" his discretion as to the allowance or amount of attorneys' fees. We agree with his rulings, and his reasons therefor, concerning the items of accounting for profits—with but one exception: We think he erred in allowing defendants to deduct their income taxes. He said, "The nature of defendants' acts is, of course darkened somewhat by the use of a false copyright label, by sales after notice, and by the defendant Lithograph's apparent unconcern over the validity of the plaintiff's copyright, so long as defendants Catalda Company and Catalda were willing to indemnify Lithograph"; he also said that defendants "were not in-

nocent of knowledge of the claimed copyright by the plaintiff of the subjects in suit." Nevertheless, he held that "their villainy is not of the deepest dye in that the copying was open, and with no attempt at concealment, under a good-faith claim of a right to copy because of the claimed invalidity of the plaintiff's copyright." With that last conclusion we disagree. Open and unabashed piracy is not a mark of good faith; and we think the "claimed invalidity" unjustified.[32] In these circumstances, the deduction of the taxes was improper.[33] To that extent only, the judgment is modified; otherwise it is affirmed.

29. Cf., United States v. Aluminum Company of America, 2 Cir., 148 F.2d 416, 443.

Defendants do not contend, nor is there any evidence in the record, that the restriction was invalid in England.

30. See also Bruce's Juices v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219; Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 832, 70 S.Ct. 894, 94 L.Ed. 1312.

31. Cf. Standard Oil Co. v. Clark, 2 Cir., 163 F.2d 917, 926; West 52nd Theatre Co. v. Tylor, 2 Cir., 178 F.2d 128; Turner Glass Corp. v. Hartford Empire Co., 7 Cir., 173 F.2d 49, 53; Interstate Hotel Co. v. Remick Music Corp., 8 Cir., 157 F.2d 744.

32. The "clean hands" defense was not in defendants' minds when they infringed; It was not contained in defendants' original answers to the complaint.

33. Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 106 F.2d 45, 53.